## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:23-cv–1237-CLS |
| | ) | |
| VILLAGE OF PROMISE, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

Elizabeth Parker, who is a white female, was hired by the defendant, Village of Promise, to serve as its Executive Director in March of 2020. Her employment was terminated by defendant on December 15, 2021. Plaintiff asserts claims of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. This opinion addresses the defendant's motion for summary judgment. Doc. no. 18.

### I. FACTUAL BACKGROUND

Village of Promise is an Alabama non-profit corporation located in Huntsville.[1] It was co-founded in 2011 by Bobby Bradley, who served in various roles, including

---

[1] Doc. no. 20 (Bradley decl.), ¶ 2, at ECF 5. "ECF" is an acronym formed from the initial letters of the name of a case filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters ECF.

as a member of the defendant's Governing Board.[2]  The organization operates a family advancement center, the mission of which is to assist families in overcoming generational poverty through education.[3]

James Gilbert, M.D., who was the Chairman of defendant's Governing Board on the date of plaintiff's employment, offered plaintiff the position of Executive Director in a letter dated March 24, 2020.  Plaintiff accepted the offer the following day.[4]

During plaintiff's tenure, the Board formed an "Executive Director and Evaluation Support Committee" to provide feedback to plaintiff.[5]  The record does not identify the members of that committee, nor does it describe the manner by which the committee provided "support" to plaintiff.

Sometime during March of 2021, the parent of a child who attended one of the defendant's programs wrote to Dr. Gilbert with a "Statement of Concern."[6]  The parent complained about her interactions with plaintiff, and stated her belief that

---

[2] *Id.*

[3] Doc. no. 20 (Plaintiff dep.), at 65-66.  The record does not more clearly define the organization's mission.  However, its website explains that: "Village of Promise empowers children and their families to break the cycle of poverty through education and multi-generational support, helping them succeed in school, work, and life."   Village of Promise Home Page, https://www.villageofpromise.org/ (last visited Oct. 9, 2025).  Village of Promise offers early childhood and adult and family programs in furtherance of its mission.  *Id.*

[4] Doc. no. 20 (Letter from James Gilbert, MD, to Elizabeth Parker), at ECF 162.

[5] Doc. no. 20 (Bradley decl.) ¶ 5, at ECF 6.

[6] Doc. no. 20 ("Statement of Concern"), at ECF 191-92.

plaintiff had treated her with disrespect.[7]  Dr. Gilbert forwarded the statement to plaintiff by electronic mail ("email") for her review and response.[8]  Plaintiff testified in deposition that she had "multiple follow-up communications" with Chairman Gilbert and the Village of Promise's co-founder Bobby Bradley, but the substance of those communications is not contained in the record.[9]

Dr. Gilbert also shared the parent's complaint with other Board members via email message on March 10, 2021.[10]  Jane Daniel, one of the Board members to whom the complaint was forwarded, suggested the following to Dr. Gilbert:

> Since this letter came to you, I would recommend you address it with [plaintiff] directly, hear her side of things and see what she recommends in terms of next steps.  She needs to be able to deal with parent concerns, and we need to ensure that we are comfortable in how she plans to do that.  If we are, we support her position and approach.  If we are not, we discuss that with her.  After talking with her, you could then report your take-aways from the conversation to this group, as part of our overall mid-year assessment.

Doc. no. 23-1 (Plaintiff's evidentiary submission), at ECF 14.  The record contains no further information about the resolution of the parent's complaint.

Later that same month, Dr. Gilbert and plaintiff met for a "mid-year

---

[7] *Id.*

[8] Doc. no. 20 (Plaintiff dep.), at 193-94.

[9] *Id.* at 194.

[10] Doc. no. 23-1 (Plaintiff's evidentiary submission), at ECF 13-15.  The individuals to whom the email was addressed were: Jane Daniel; Wendy Yang; Kandy Gardner; and Bobby Bradley.

discussion."[11]  Dr. Gilbert summarized the meeting in an email message to plaintiff

dated March 25, 2021, and reading as follows:

> Summary of Mid-Year Discussion:
>
> 1.     The full board recognizes the tremendous work you have put forth
> . . . especially in a Covid year.
>
> 2.     Concern with timeliness to meetings for a smooth transition as you
> are always on the top of the agenda.
>
> 3.     Critical listening.  "I never learned anything when talking," Larry
> King.
>
> 4.     Optimal Team Communication at VoP: Employees as customers
> too.
>
> 5.     Managing Growth
>        a.     You have permission to slow down and focus on processes
>        rather than growth.
>        b.     Critical New Hires: Finance and Education Directors.
>        c.     Continue to optimize your personal growth with mentor
>        relationships.
>
> 6.     Develop a strategy to work with disagreeable colleagues
>
> Libby [*i.e.*, the nickname of plaintiff, Elizabeth Parker]: You really
> help[ed] me to understand how some members of your team will see
> your focus on metrics as threatening.  This is clearly a need to grow the
> team toward a better understanding of the big picture of the VoP and
> their role in making the promise possible.  The change in mindset that we
> desire for our families must first start with us.

Doc. no. 20, at ECF 197 (ellipsis in original, alterations supplied).

---

[11] Doc. no. 20 (Plaintiff dep.), at 198-202.

Plaintiff responded by sending a lengthy email message on that same date to Dr. Gilbert and Board member Wendy Yang.[12] Plaintiff detailed her accomplishments, and expressed her disappointment that, in her opinion, her accomplishments were not appropriately recognized during the "mid-year discussion." The following excerpt from plaintiff's response distills her dissatisfaction:

> Honestly, I'm concerned after reading your summary that the board **does not** realize the tremendous work that was put forth and how challenging it was to get others on board in order to accomplish these things. With everything that has happened this year, and looking at where we were to where we are now, this summary of my performance is missing something. I find it a bit underwhelming and hurtful.

Doc. no. 20, at ECF 196 (boldface type in original).

During July of 2021, at plaintiff's suggestion, the Village engaged Higher Echelon, a consulting group, to evaluate and advise the organization for strategic planning.[13] Dr. Gilbert explained the process to plaintiff and Board members in a July 20, 2021 email message, reading as follows:

> The Strategic Planning Committee had a very good virtual meeting with the Higher Echelon team (Joe Ross, Donnie Horner, Rene Elliott, Chang Ko, and Sarah Milz). The structure, in brief, begins with a private in-person 2 ½ hour process interview with [plaintiff]. This is then followed by a similar in-person interview with the Board. There will be another process interview with the VoP senior leadership. This is followed by a fourth process interview with relevant key stakeholders. We then have

---

[12] Doc. no. 20, at ECF 194-97. It is not clear from the record why Wendy Yang was included as a recipient of plaintiff's response.

[13] Doc. no. 20 (Plaintiff dep.), at 207-09; *see also id.* (Bradley decl.), ¶ 6, at ECF 6.

four virtual meetings drilling down on vision alignment, preparing a SWOT [*i.e.*, Strengths, Weaknesses, Opportunities, and Threats] analysis, market analysis, system and structure analysis, and outreach analysis. We will also define strategies, implementing tactics, and responsibilities for implementing the approach. After this 3-month process, we will emerge with a Strategic Plan.

Doc. no. 20, at ECF 211 (alterations supplied). Dr. Gilbert proposed dates during August to begin the evaluation.[14]

During that same timeframe, plaintiff received an annual review conducted by the "Board Chair and members of the Executive Director Support & Evaluation Committee, with input from the Board of Directors."[15] Plaintiff received the following "Overall Leadership Effectiveness Rating," which was based upon a scale of 1 to 5, with 5 signifying "very effective":

| | |
|---|---|
| Mission-driven leadership and strategic visioning | 4 |
| Community engagement and development | 4 |
| Effective communication/interactions with constituents | 3 |
| Operational and Financial Management | 4 |
| Personnel Management | 3 |

Doc. no. 20, at ECF 201-04. The review contained "highlights" for the rating period, and detailed plaintiff's significant accomplishments in the areas of: "Mission Driven

---

[14] Doc. no. 20, at ECF 211-12.

[15] Doc. no. 20, at ECF 201-04. Other than Dr. Gilbert, who signed the review, the names of the reviewers are not contained in the record.

Leadership and Visioning"; "Operational and Financial Management"; and, "Community Engagement and Development."[16]  The review also addressed "Areas of Focus/Improvement for Coming Year."  Specifically, the review provided plaintiff with suggestions for her improvement in the areas of "critical listening and communication," "staffing," and "culture of trust and transparency."  The review concluded with the following summary:

> [Plaintiff] has been a strong operational leader in a challenging year. She has worked with passion and determination to address numerous needs and to ensure successful delivery and growth of programs in support of the VoP mission, all while operating under unprecedented conditions resulting from the COVID-19 pandemic and constrained facility space.  With careful consideration of the needed areas of focus, strong leadership in a critical period of strategic planning, and strengthened partnership with the Board of Directors, the Board looks forward to supporting and positioning [plaintiff] for continued success in leading the Village of Promise forward.

Doc. no. 20, at ECF 204 (alterations supplied).  Plaintiff signed the review on August 18, 2021, but added the following notation: "I do not feel the scores reflect the magnitude of what was accomplished vs. what was inherited.  I will work hard to improve these scores."[17]

On September 8, 2021, Board member Kandy Gardner notified plaintiff via email of the details of an upcoming audit.[18]  Plaintiff forwarded the message on that

---

[16] *Id.* at ECF 202-03.

[17] *Id.* at 204.

[18] Doc. no. 20, at ECF 223-24.

same date to Beth Richardson — who had assumed the role of Board chairperson

following the conclusion of Dr. Gilbert's term — and expressed concerns about the

audit.[19]  She stated:

> Did you know that Kandy made this commitment?  Has the board (full
> board) voted?  We have now committed 5K-6,500 more than other non-
> profits pay for the same services.  We are starting in September when
> October was what was discussed with me and requested by me with no
> explanation.
>
> It would at least be nice to be asked about days to begin.  I am booked
> most of the 14th.  If she [Kandy Gardner] is not going to be here, will
> she have the items needed for [the auditor] to get started?
>
> I'd like to know what is expected of me and my staff.  What documents
> do we need to have ready?
>
> There was supposed to be a list requested.  If she has been given that list
> by [the auditor], I haven't seen it.  Would be helpful.
>
> I still don't have a FINAL copy of the approved budget, only the
> abbreviated budget given to the board for a vote.
>
> I do not have access to Quickbooks.  Never have.
>
> So what is my role and what is the role of the board?  Are you a
> governing board or operational?  If you are operational, there are several
> items that I've been handling that should be taken off my plate and given
> to the proper people — whomever they may be.
>
> I need clarity.

Doc. no. 20, at ECF 221-22 (alterations supplied).  New Board Chairperson Beth

---

[19] *Id.* at ECF 221-22.

Richardson responded to plaintiff as follows:

> Hi Dr. Parker,
>
> I hope all is well with you and the Village.
>
> As you may recall in the executive committee meeting the recommendation was to move forward with the increased fee for this year's audit based on the need to support grant applications, the current vacancy in the financial director position which Kandy is currently filling and meeting the needs, and the current auditor's familiarity with the organization versus the learning curve any new auditor [would have]. Kandy's work and keeping you in the loop is in keeping with the recommendation. The full board has approved the budget. There are approved budgeted line items that have not been used this year that will cover and offset cost of the increased audit fee. We also discussed requesting bids and proposals from auditors next year.
>
> The larger question of a governing versus operational board is one you raise regularly. As we've discussed, this is a process, not a sudden switch that we will flip to change governance models. This was also discussed in your most recent review. Your questions warrant a meeting to further discuss and provide clarity. Lynne [presumably, this is a reference to Board member Lynne Berry[20]] and I would like to meet with you the week of September 20. Please let me know your availability.

*Id.* at ECF 219-20 (alterations supplied).

Board Chairperson Richardson then forwarded copies of all of the foregoing

messages to her predecessor, Dr. Gilbert, who responded as follows:

> I like your response. It is appropriate and clear. The question of governance or operating board centers around control. Our responsibility at this point in the VoP lifecycle is as an operating board. Personally, my confidence in Libby to carry out crucial decisions does

---

[20] *See* doc. no. 20, at ECF 11.

not allow us to venture into the realm of a governing board.  Libby does
not have sufficient senior leadership counsel to navigate the landscape.
We have to remain operational.

*Id.* at ECF 218.

Also on September 8th, Richardson sent an email message to all Board

members[21] in which she stated, in relevant part, that she was:

> writing confidentially to let you know of continued concerns with our
> executive director.  There have been a number of instances in the last
> few weeks that have highlighted the concerns mentioned in our initial
> strategic planning sessions.  Lynne [again, presumably Lynne Berry[22]]
> and I feel a need to have a conversation with Dr. Parker to try and bring
> clarity and understanding.  Her relationship with the board seems to be
> deteriorating.  Please let me know what specific concerns or questions
> you would like for Lynne and I [*sic*] to address with her by Friday noon.
> We are moving forward with the audit and should receive a draft by
> October 15. . . .

Doc. no. 20, at ECF 11-12 (alterations supplied).

Dr. Gilbert responded to Richardson's message on September 9, 2021, saying

that:

> My observation is that Libby [plaintiff] has trouble in receiving
> suggestions, observations, or feedback that may improve the
> performance at the VoP, develop the talent of her staff, align
> expectations at the VoP, and promote the culture of the organization.
> These suggestions or feedback are too often taken as personal criticisms
> of her leadership and this stifles the conversation.  This has occurred in
> my communications with her but I have also witnessed it at Executive

---

[21] The recipients of the message were: Lynne Berry; Kandy Gardner; Alice Lanier; Jane
Daniel; Bobby Bradley; Dr. Gilbert; Wendy Yang; Peggy Sammon; and, Marshanne Castro.  *Id.*

[22] See note 20, *supra.*

10

Committee and board meetings.  I believe Board members do make the well-intentioned suggestions in an effective and noncritical manner; however, Libby has not always taken it as such.  At times, her responses have been inappropriately defensive.  There is a needed relationship discussion concerning the Board and the Executive Director and how to develop trust.  Her responses reflect she believes we are, at times, off base, and she responds out of her feelings:  indignant, wronged, or exasperated.  She will often ask are we a governing board or an operational board, which I interpret [as saying]: stay in your lane.

During her evaluation, we did touch on the subject of communication, both verbally and via email.  In reviewing her performance, we were very careful to place the praise of her performance in front of any perceived critical feedback.  Libby should appreciate the viewpoint of the Board, which is supportive, and [that] our suggestions, observations, and feedback are given in support of her and the organization (this too was emphasized during the evaluation process).  We never, however, explored her relationship with her past boards and this may shed light regarding her present posture.

Thank you for exploring this as it is critical for the continued growth of the VoP.  I am hoping your discussions may untangle the "what" from the "who" and allow more appropriate sorting and filtering of the VoP board discussions for her.  It is essential that Libby be able to grow as the ED [Executive Director] and have complete trust between the Board and her.  Her ability to pull value from criticism and feedback in site of her natural tendencies (which we all have) to reject it, even to truthfully seek it out from the Board, senior leadership, and staff is critical to establishing a healthy culture at the VoP.

Doc. no. 20, at ECF 10-11 (alterations supplied).  There is no indication in the record whether the Board's concerns with Dr. Parker's performance were further addressed.

Higher Echelon, the consulting firm engaged by the Village's Board to develop

a strategic plan, presented its report to the Board on October 13, 2021.[23]  The report as prepared was based in part upon two "strategic vision sessions," during which plaintiff, the Board, the "senior leadership team," and "other relevant key stakeholders" were interviewed.[24]   In all, 41 individuals participated in the assessment.[25]

The company's findings with respect to plaintiff were summarized in terms of "positive" and "negative" considerations.   The positive aspects of plaintiff's performance as Executive Director were stated as follows:

- Better organized: processes and procedures improving

- Financial tracking and expenditures

- Grant writing and awards

- Organization becoming more disciplined

- Good at running programs

- Building document trail and infrastructure (legitimacy)

Doc. no. 20 ("Strategic Planning — Assessment"), at ECF 36.  The "positive" section also included what appears to be a compilation of participants' comments:

"What Dr. Parker inherited was a train wreck.  No processes.  No knowledge.  No procedures.  Unqualified workers.  Bad payroll

---

[23] Doc. no. 20 (Bradley decl.)¶ 8, at ECF 6.

[24] *Id.* ("Strategic Planning — Assessment"), at ECF 19.

[25] *Id.* at ECF 23.

practices.  No metrics.  No transparency.  Last minute procurement with
no intentionality.  **Mixed pots of monies wrongly spent.**  Sloppy to say
the least.  We're still in transition.  We're getting better."

*Id.* (boldface type in original).

The "negative" aspects of plaintiff's performance as Executive Director were

summarized as follows:

- • Poor people skills

- • Show up late to events

- • Misses opportunities to tell the VoP story

- • Not a relationship builder

- • Educator mindset vs. a community builder mindset

- • Internal and external communications lacking.

*Id.*  The compilation of "negative" comments reads as follows:

"She's hard to deal with and does not do relationships well.  Tardy on
phone calls.  Not the face you'd want for VoP.  Still, she has bolstered
the staff, added structure and added processes.  She can run programs."

*Id.*

Higher Echelon included a recommendation to "redesign the current Executive

Director position."[26]  Specifically, the company suggested that the Village of Promise

do the following things:

1.    Convert the existing Executive Directorship to 2 positions: Chief

---

[26] *Id.* at ECF 69.

Executive Officer (CEO) and COO (Chief Operating Officer).

2.    Make the CEO the face — internal and external — of VoP with primary roles of fundraising, lobbying, community engagement, media relations, and public appearances/speaking.

3.    Make the COO responsible for managing the staff, day to day operations, program management, and grant/proposal writing.

*Id.* at 69.

The Board met on December 9, 2021, to address, among other matters, the Strategic Planning Assessment and plaintiff's performance as Executive Director.[27] During the meeting, the Board voted to terminate plaintiff's employment.[28]   A few days thereafter, Lynne Berry and other Board members met with plaintiff and informed her that the Board had voted to terminate her employment.[29]   Plaintiff was offered the opportunity to resign, but she declined to do so.   Therefore, her employment was terminated.[30]

Board member Lynne Berry did not provide the exact date of the meeting in her declaration, but plaintiff stated in her EEOC charge of discrimination and in the complaint that her employment was terminated on December 15, 2021.[31]

Following plaintiff's termination, the Board voted to offer Bob Ludwig, who

---

[27] *Id.* (Bradley decl.) ¶ 12, at ECF 7.

[28] *Id.*

[29] Doc. no. 20-2 (Berry decl.) ¶ 4, at ECF 13.

[30] *Id.* at ECF 13-14.

[31] *See* doc. no. 1-1 (Charge of Discrimination), at ECF 2; doc. no. 1 (Complaint), ¶ 40.

is a white male, the position of Interim Executive Director.[32]  He accepted the offer

and served in that position until June of 2022, when the Village hired Dana Gillis, a

black male, as Chief Executive Officer.[33]

Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission on June 13, 2022.[34]  The EEOC issued a notice of right to

sue on June 21, 2023,[35] and this lawsuit followed.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In

making this determination, the court must review all evidence and make all reasonable

inferences in favor of the party opposing summary judgment."  *Chapman v. AI*

---

[32] Doc. no. 23-1 (Plaintiff's evidentiary submission), at ECF 17.

[33] Doc. no. 23-1 (Defendant's Responses to Plaintiff's Interrogatories and Requests for Production), at ECF 38.

[34] Doc. no. 1-1 (EEOC Charge of Discrimination).

[35] Doc. no. 1-2 (Notice of Right to Sue).

*Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration and emphasis supplied).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251–52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

### III.  DISCUSSION

Both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, provide a federal remedy against discrimination (disparate treatment) in private employment on the basis of race.  *Johnson v. Railway Express Agency*, 421 U.S. 464, 459-60 (1975); *Caldwell v. National Brewing Co*. 443 F.2d 1044, 1046 (5th

Cir. 1971), *cert. denied*, 405 U.S. 916 (1972).  Both statutes prohibit racial discrimination against white persons, as well as nonwhite individuals.  *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 280, 286-87 (1976).  Indeed, Section 1981 has been described as "a parallel remedy against [racial] discrimination which . . . derive[s] its legal principles from Title VII."  *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).[36]  In other words, because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework, . . . [courts within the Eleventh Circuit] explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (ellipsis and alteration supplied); *see also*, *e.g.*, *Lincoln v. Board of Regents of University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When, as in this case, the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of a claim are identical to those of a claim under § 1981."); *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (observing that race discrimination claims brought under Title VII and § 1981 "are subject to the same standards of proof and employ the same analytical framework"); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th

---

[36]The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

Cir. 1980) ("When section 1981 is used as a parallel basis for relief with Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706 [of Title VII, *i.e.*, 42 U.S.C. § 2000e-5].") (alteration supplied, citations omitted)).

The analytical framework applicable to both Title VII and § 1981 claims is the *McDonnell Douglas* burden-shifting framework, which places the initial burden of establishing a *prima facie* case of race discrimination on the employee. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767-68 (11th Cir. 2005) (describing the elements of "the familiar *McDonnell Douglas* framework")

Under that framework, plaintiff must first establish a *prima facie* case of disparate treatment. If she does so, that gives rise to a presumption of discrimination, which the employer must rebut by articulating a legitimate, nondiscriminatory reason for the disputed employment action. If the employer satisfies its burden, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff, to show that the employer's proffered reason is merely a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

In order to establish a *prima facie* case of disparate treatment based upon the

plaintiff's race, she must show that: (1) she is a member of a protected class; (2) she was qualified to perform the duties of her position; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her protected class more favorably, *or* that she was replaced by a person outside her protected class. *See, e.g.*, *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

The first three elements are not contested. With respect to the final element, the defendant contends that plaintiff has failed to show that she was treated less favorably than a similarly situated employee outside her protected class. Plaintiff does not dispute that contention but, instead, argues that she was ultimately replaced by a person outside her protected class.

Following plaintiff's termination as Executive Director in December of 2021, the defendant's Board selected Bob Ludwig, who is a white male, to serve as Interim Executive Director.[37] Six months later, during June of 2022, the defendant hired Dana Gillis, a black male, for the position of "Chief Executive Officer."[38] Plaintiff, who is a white female, argues that she was "replaced" by Gillis, and that she established a *prima facie* case of discrimination.

---

[37] Doc. no. 23-1 (Defendant's Responses to Plaintiff's Interrogatories and Requests for Production), at ECF 38.

[38] *Id.*

The defendant disputes that contention, citing plaintiff's failure to proffer evidence that Gillis performed the same duties that plaintiff had performed as the defendant's Executive Director. While that contention is correct, a large logical leap is not required to conclude that Gillis, who assumed the Village's top administrative position, performed as "Chief Executive Officer" at least *some of the same* job duties that plaintiff had performed as "Executive Director." *See, e.g.*, *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987) (plaintiff established *prima facie* case even where the successor employee performed only some of the terminated plaintiff's job duties); *Smith v. Euro-Pro Operating, LLC*, No. 3:05-cv-1186-MEF, 2007 WL 735674 at *5 (M.D. Ala. Mar. 7, 2007) (observing that, even if another employee "did not completely fill [the plaintiff's shoes], [he] put his foot far enough in to replace [the plaintiff] for a short period of time."). Accordingly, the court finds that plaintiff has made a sufficient showing that she was replaced by a person outside her protected group — *i.e.*, by Dana Gillis, a black male. Therefore, plaintiff has established a *prima facie* case of unlawful race discrimination under the *McDonnell-Douglas* burden-shifting framework.

The burden now shifts to defendant to rebut the inference of race discrimination raised by plaintiff's presentation of a *prima facie* case by presenting legitimate, non-discriminatory reasons for plaintiff's termination. *See Holifield v. Reno*, 115 F.3d

1555, 1564 (11th Cir. 1997). "This intermediate burden is 'exceedingly light.'" *Turnes*

*v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

The record amply demonstrates that the Board was dissatisfied with plaintiff's

performance. During March of 2021, Dr. Gilbert identified for plaintiff, as part of

their "mid-year discussion," areas where her performance could improve. In

particular, he noted critical listening, communication, and timeliness.[39] Plaintiff's

annual review, while largely positive, also suggested that there was room for plaintiff

to improve her performance in the areas of "critical listening and communication,"

"staffing," and developing a "culture of trust and transparency."[40] In October of 2021,

the independent consultant engaged to assist the defendant in developing a strategic

plan reported to the Board, based upon its interviews with leadership, staff, and other

stakeholders, that plaintiff had "poor people skills," was late to meetings, missed

opportunities to "tell the VoP story," was "not a relationship builder," and that

"internal and external communications [were] lacking."[41]

Additionally, the record contains evidence that plaintiff's interactions with the

Board and others were contentious. For instance, during March of 2021, the Board

received a complaint from a parent that plaintiff had not treated her with respect. The

---

[39] Doc. no. 20, at ECF 197.

[40] *Id.* at ECF 201-04.

[41] Doc. no. 20, at ECF 36 (alteration supplied).

record also contains electronic mail messages among Board members and plaintiff reflecting concerns with plaintiff's interactions with them, staff, and the public. The record reflects that the Board addressed those issues with plaintiff, but that their concerns were not corrected to the Board's satisfaction. Accordingly, on December 9, 2021, the Board voted to terminate plaintiff's employment. The court concludes that the defendant's proffered reasons for plaintiff's termination were legitimate and nondiscriminatory.

Therefore, the burden shifts back to plaintiff to demonstrate that the Village's stated reasons for her termination were a pretext for discrimination. She may do so by "producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994).

When evaluating a motion for summary judgment, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (alteration supplied, internal quotations and citations omitted).

Plaintiff contends that the defendant's position statement to the Equal

Employment Opportunity Commission creates such an inconsistency because the statement did not include the fact that Dana Gillis, who is a black male, had been hired as Chief Executive Officer and, instead, only referred to the defendant's retention of an interim Executive Director, who was a white male, following plaintiff's termination.[42]  Such an "inconsistency," if it even is such, does not cast doubt on the credibility of the defendant's stated reasons for plaintiff's termination.

Finally, plaintiff argues that the defendant offered "after the fact" justifications for her termination, because at the time of her termination, she was told only that she was "not a good fit."  While plaintiff may not have been told all of the reasons for her termination, the record is clear that the Board was dissatisfied with plaintiff's performance over a period of several months preceding her termination, and directly addressed with her the shortcomings in her performance.  Accordingly, the court cannot conclude that the defendant was not actually motivated by its proffered legitimate, non-discriminatory reasons for terminating plaintiff's employment, and her claims under Title VII and 42 U.S.C. § 1981 must fail.

## IV.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted.  A separate order consistent with this memorandum opinion will be

---

[42] Doc. no. 23-1 (EEOC Position Statement), at ECF 8.

entered contemporaneously herewith.

**DONE** and **ORDERED** this 9th day of October, 2025.

_____
Senior United States District Judge